Syntron Company v. Commissioner.
Syntron Co. v. Commissioner
Docket No. 109220.
United States Tax Court
1943 Tax Ct. Memo LEXIS 437; 1 T.C.M. (CCH) 643; T.C.M. (RIA) 43094; February 22, 1943
*437 Norman D. Keller, Esq., and A. G. Wallerstedt, C.P.A., for the petitioner. Paul E. Waring, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies in income tax for the taxable year January 1 to March 31, 1937 of $279.36 and for the fiscal years ending March 31, 1938 and 1939 of $4,118.20 and $2,071.97, respectively. The error assigned is the disallowance by respondent of deductions taken by petitioner in each year as allowable amortization or depreciation of cost of patent licenses acquired in exchange for the issuance of certain of its capital stock. Findings of Fact Petitioner is a Delaware corporation organized on January 29, 1921, under the name of National Electric Manufacturing Company, this being later changed to Syntron Company. Its business is located in Pittsburgh, Pennsylvania, and its returns for the taxable years here involved were filed with the collector for the Twenty-Third Collection District of Pennsylvania. The circumstances which gave rise to the organization of petitioner were that prior to 1919 two young electric engineers, Carl S. Weyandt and G. E. Hampton, employed by the Westinghouse *438 Electric & Manufacturing Company, had been carrying on in their spare time certain experimental work on the invention of a reciprocating electric motor. In that year they interested one A. C. Leslie, a banker, in their work and, as a result, a corporation was formed under the name, Central Electric Tool Company (hereinafter referred to as "Central"). This corporation had an authorized stock issue of 50 shares, of which 25 were issued to Leslie and 12 1/2 to Weyandt and Hampton, each. The latter two persons conveyed to the corporation the patent applications filed by them and were employed by the corporation to carry on the work of developing and perfecting the invention. In the invention on which applications for patents had been filed, the electric reciprocating motor had been applied to an electric hammer or drill. The principle was a solenoid, the coil being magnetized by a current of electricity causing the piston within the coil to move. To cause the movement of the piston back and forth it was necessary to break the current and demagnetize the coil between each movement. This was accomplished with an automatic electric switch or circuit breaker. When the first electric hammer *439 of this design was made, however, it developed that though successful from a technical standpoint, in that it operated, it was not practical for the reason that its necessary operation at high speed with the circuit broken 3,600 times per minute caused the switch, which had moving parts, to burn up. Faced with this situation, Weyandt and Hampton continued their experimental work and finally devised an electric valve without moving parts in the use of which the circuit could be broken and the electric impulses synchronized and which was not affected by high speed operation. In the latter part of 1920 a perfected model was constructed embodying this device. At this time there was no other practical reciprocating electric motor devised. Many efforts had been made to perfect one and many patent applications filed but all of the inventions had proved impractical due to the use of an electric switch. The field for the use of such an invention, if perfected, was wide. One of the main power tools to which its use could be applied was an electric drill or hammer. Many rotary electric drills were on the market but their use was limited to boring in metal and wood. The only direct hammer action *440 power tools of this character were operated by steam or compressed air and not only required an air compressor or steam generator as an adjunct to operation, but were heavy and cumbersome, whereas the electric hammer or drill could be made light in weight with one moving part and be operated anywhere an ordinary house lighting alternating electric current was available. Such electric drills and hammers could be used by merely changing the drill or hammer point as tampers, cutters and shapers in many lines of industry. The principle of the reciprocating electric motor, moreover, was applicable to numerous other devices such as shapers, conveyors and packers in which vibration is essential to maintain or regulate the flow of or cause the settlement of material. In 1920, one F. T. Bowman, vice president of Blaw-Knox Co. of Pittsburgh, a large manufacturer of machinery, heard of the invention and asked permission to inspect it. Bowman was a graduate engineer and in charge of one of the divisions of Blaw-Knox Co. and a man of large means. He made many trips to the Central shop, studied the device and finally made an offer of $300,000 for the patent rights. This offer was refused by Leslie, *441 Weyandt and Hampton since they desired to form a corporation for the purpose of manufacture. Finally, on January 29, 1921, the petitioner was incorporated with an authorized issue of 6,000 shares of common capital stock. Of this issue, half of the shares were of Class "A" and half of Class "B". The stock of the two classes was identical in all rights of voting, participation in earnings and upon liquidation. The only difference was that Class "A" had a par value of $100 per share, and Class "B" had no par value. On February 11, 1921, an agreement was entered into by petitioner with Central under which the latter conveyed to petitioner the exclusive license to manufacture and sell under the basic patents the applications for which had been assigned to it as heretofore detailed, and any other patents representing improvements thereon which they might acquire. The consideration for this exclusive license was to be the issue to Central of the 3,000 shares of petitioner's authorized Class "B" stock which was to be issued and delivered as the Class "A" stock was sold and issued so that at all times there would be outstanding the same number of shares of each class of stock. Petitioner *442 also agreed to loan Central the sum of $50,000. The first shares of petitioner's Class "A" stock were issued on March 22, 1922. Between that date and May 23, 1928 a total of 2,736 such shares were issued to 107 different purchasers, all of it for cash, at $100 per share. The majority of this stock was sold in 1922 and 1923 and practically all of the remainder before 1927. Among such purchasers, in substantial amounts, were Leslie, Weyandt, Hampton, Bowman and John A. Metz, the latter being the petitioner's attorney who became identified with its active management. On January 17, 1928, petitioner issued to Central 2,820 shares of its Class "B" stock under the provisions of the aforementioned agreement. Between May 29, 1923 and December 1927 assignments were made by Weyandt and Hampton to Central of patents covering the synchronous reciprocating electric motors, the device perfected by them in 1920 while in its employ. Petitioner entered into manufacture of the electric hammer in 1922. The device proved successful and is the same, without basic change, which it manufactures at the present time. Petitioner's gross sales and net income or loss, for the years 1923 to 1942, were as follows: *443 Gross
Net
Net
Sales
Income
Loss
1923
$101,227.76
$10,189.48
1924
255,491.40
42,674.01
1925
314,874.48
$ 15,146.15
1926
382,120.70
20,919.06
1927
332,998.73
2,446.29
1928
323,196.46
2,753.47
1929
550,110.44
24,697.22
1930
344,191.88
4,257.94
1931
258,663.37
9,608.47
1932
70,855.91
24,754.55
1933
107,699.12
488.56
1934
175,415.74
8,288.00
1935
191,364.18
2,614.59
1936
349,295.21
14,365.06
(3 Mos.)
122,060.44
2,760.88
1938
426,347.80
1,883.11
1939
388,608.13
406.47
1940
488,022.36
24,301.74
1941
631,081.93
74,960.73
1942
967,715.76
131,393.72
Following the organization of petitioner, its operations were dominated by Leslie and for some years its management was unwise and extravagant. Although it was doing a substantial manufacturing business, its income was in a large measure wasted through excessive sales and promotion expense. For several years Weyandt and Hampton were separated from the manufacturing and selling activities of petitioner and kept at work perfecting various devices employing the use of the electric motor and these, when perfected, were not put into production but set aside. *444 Leslie, who owned 50 shares of stock in Central, became involved in serious personal financial difficulties. On one occasion in 1926 he came to Metz who was president of Central and advised him that the bank had refused payment on a check for $24,000 issued by him, or by another business he owned and operated, and that it was imperative that he secure this amount in cash at once. He stated that his only available asset to realize upon was his stock in Central. Metz suggested that Bowman be approached and offered some of the stock. Leslie thereupon offered to sell 8 shares of Central stock for $24,000, and Metz went at once to Bowman who immediately accepted the offer and closed the deal on that or the following day. Central never engaged in manufacturing. He merely owned and developed patents. At this time it was inactive, was largely indebted to petitioner and its only assets were its rights to receive Class "B" stock of petitioner under the contract of February 11, 1921 and the legal title to certain patents and patent applications on which an exclusive license had been conveyed to petitioner. The 2,820 shares of petitioner's Class "B" stock issued for an exclusive patent license *445 had a fair market value of $100 per share and the patent licenses had a fair market value of not less than $282,000 when acquired. In making its returns for the taxable years here involved petitioner deducted depreciation on its patent licenses acquired in exchange for 2,280 shares of its Class "B" stock on a basis of a cost of $282,000. In determining the contested deficiencies respondent disallowed such deduction. The propriety of that action is the only submitted issue. Opinion Respondent does not question the fact that the patent licenses acquired by petitioner constituted an asset subject to depreciation upon its cost and at the rate used, or that petitioner in fact acquired such licenses in exchange for 2,820 shares of its Class "B" common stock. His contention apparently is that the Class "B" stock had no fair market value when exchanged. We thus have presented the fact question of the stock value. The Class "B" stock and "A" issue were identical except the former had no par value while the latter had a par of $100 per share. As each share of Class "A" stock was sold petitioner was obligated to issue a share of Class "B" stock to Central. It is therefore manifest that whatever *446 fair market value the Class "A" stock had, if any, must necessarily be ascribed to the Class "B". All of the Class "A" stock issued was sold for cash at $100 per share. It is recognized that, ordinarily, the best evidence of the fair market value of a stock is the price at which it is sold. ; ; ; . It is true that such value may be less than its sale price when sold to a purchaser who is ignorant of the market. But there is not the slightest indication of such a condition here. The individuals responsible for the organization of petitioner and the sale of its Class "A" stock to the public at $100 per share were buying, for their own accounts, substantial amounts of it at the same figure. One of such persons, Leslie, in 1926, sold to another, Bowman, 8 shares of Central stock for $24,000 when the right to receive petitioner's Class "B" stock under its contract with petitioner was the only *447 asset of substantial value that Central had. And the circumstances of that sale clearly indicate that it was essentially a forced sale, made at a time of great emergency, in which the seller would normally be forced to sacrifice a substantial part of the actual value of the security. Respondent points to the fact, disclosed by the evidence, that in 1932 petitioner reacquired from Central 2,100 shares of its Class "B" stock for the cancellation of an indebtedness of $62,484.95 of that company. This is urged as establishing that petitioner's Class "B" stock could not have been worth $100 per share some years earlier. We do not agree. The transaction was between two closely allied corporations. The individuals owning Central were largely interested in petitioner. Moreover, the transaction was long after the initial period of valuation here and at the depths of the financial depression. Respondent argues, however, that the exclusive patent license had no value when acquired and, consequently, no value can be ascribed to the stock exchanged therefor. Assuming the correctness of the premise, that conclusion may not be sound. See . *448 Certainly the Class "B" stock would not have been wholly valueless here. It was issued concurrently with Class "A" and would have a value, at least, of half of the consideration paid for the Class "A" or $50 per share. See . We do not think, however, that the license was without value when acquired. Respondent insists that the basic invention by Weyandt and Hampton was not perfected until after the acquisition of the license but the record does not sustain this. The invention had been perfected in 1920 and petitioner's agreement with Central gave it the exclusive right of manufacture and sale. Nor do we consider as establishing an absence of value for the Class "B" stock or the patent rights, the fact that Metz and Weyandt, as officers of petitioner, filed for it under oath with the State of Pennsylvania a "Capital and Corporate Loan Tax Report" for each of the years from 1926 to 1936 in which no actual value for its patents and patent rights was included. We would hardly accept a statement in such reports as establishing a value. . So too, on this *449 record, such statements do not prove its absence. The evidence, we think, definitely shows that the patent rights had a large value and demonstrates clearly that the statement of no value in the report was inaccurate. At most, this inaccurate statement may be said to discredit to some extent the testimony as to value by these two officers of petitioner. But the evidence of substantial value of the rights is not by any means confined to their testimony. Two other qualified witnesses expressed the opinion that the exclusive license was worth more than $300,000 in 1921. The invention was original and filled a definite need in the field of power tools. It had no competition in its particular line. The offer of $300,000 by Bowman for the invention is significant. Its circumstances entitle it to considerable weight. Bowman was a graduate engineer and vice president of a large machinery manufacturing company and in charge of one of the divisions of its plant. He was qualified to understand and judge the value of the invention. The offer was made after he had examined and studied the invention in many trips to the Central workshop. He was a man of large means and after his offer was refused *450 he invested a substantial amount in petitioner's stock. Cf. . We are convinced from all of the evidence that our finding of value for petitioner's Class "B" stock is amply supported. It follows that petitioner is entitled to the disputed deductions for depreciation. Decision will be entered under Rule 50.